**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PETER J. MIZIOCH, an Arizona resident,<br><br>    Cross-Claimant,<br><br>vs.<br><br>JIMMY RAY MONTOYA, an Arizona resident, MARK CASEY MONTOYA, an Arizona resident, RUSSELL LYNN MONTOYA, an Arizona resident,<br><br>    Cross-Defendants. | No. CV10-01728-PHX-JAT<br><br>**ORDER** |

Currently pending before the Court are Cross-claimant/Defendant Peter Mizioch's Motion for an Order Restricting Extrajudicial Comments by the Parties and Counsel and Motion for an Order Shortening Time to Respond. Also pending is the Cross-claimant/Defendants Mark Montoya and Russell Montoya's Motion to Disqualify Davis Miles PLLC as Counsel for Peter Mizioch.[1] For the reasons set forth below, the Court denies all three Motions.

---

[1] Though oral argument was requested on the Motion, because both the parties submitted memoranda discussing the law and evidence in support of their positions and oral argument would not have aided the Court's decisional process, the Court will not set oral argument. *See e.g., Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

## I. Background

Phyllis Mizioch ("Decedent") died as a result of three gunshot wounds on July 6, 2010. After her death, Peter Mizioch ("Mr. Mizioch") filed a claim with Protective Life Insurance Company to collect a life insurance policy under which he was the primary beneficiary. On August 13, 2010, Protective Life Insurance Company filed a complaint in this Court over a concern that it could not identify the proper beneficiary of the life insurance policy.[2] Although Peter Mizioch is the named beneficiary, Protective Life Insurance became aware that he is a "person of interest" in the still unsolved murder case of the Decedent. In the event that Mr. Mizioch were found to be involved in his wife's murder, the life insurance policy would revert to the estate, and Mark Montoya and Russell Montoya ("Montoyas") would then become beneficiaries of the life insurance policy.

## II. Motion to Disqualify

Under Rule 83.2(e) of the Local Rules of Civil Procedure, "[t]he 'Rules of Professional Conduct,' in the Rules of the Supreme Court of the State of Arizona, shall apply to attorneys admitted or otherwise authorized to practice before the United States District Court for the District of Arizona." To disqualify an attorney for a violation of Rule 1.9 of the Arizona Rules of Professional Conduct, the Court must determine (1) whether Mr. Montoya is a former client of Davis Miles, and (2) whether, in representing Mr. Mizioch in the current litigation, Davis Miles is "representing someone in the same or a substantially related matter whose interests are materially adverse" to Mr. Montoya's interests. *Foulke v. Knuck*, 784 P.2d 723, 726-27 (Ariz. Ct. App. 1989). The Court will consider both these questions in turn.

### a. Former Client

An attorney-client relationship is proved "by showing that the party sought and

---

[2]On March 9, 2011, this Court granted an order consolidating *AXA Equitable Life Insurance Company v. Peter Mizioch, et al.* (CV10-02341-PHXROS), another interpleader action, with *Protective Life Insurance Company v. Peter Mizioch, et al.* (CV10-1728). (Doc 111.) Both cases involve the proper beneficiary for life insurance policies on Phyllis Mizioch.

- 2 -

1 received advice and assistance from the attorney in matters pertinent to the legal profession." 2 *Matter of Petrie*, 742 P.2d 796, 800 (Ariz. 1987). The test is a subjective one, and the Court 3 must look at "the nature of the services rendered, the circumstances under which the 4 individual divulges confidences, and the client's belief that he is consulting a lawyer in that 5 capacity and his manifested intention to seek professional legal advice." *Foulke*, 784 P.2d 6 at 726 (internal citations and quotations omitted). Although payment for legal services is not 7 dispositive, such payment is "persuasive evidence that an attorney-client relationship was 8 established." *Id.*

9 In the "Declaration of Mark C. Montoya," Exhibit B of the Motion to Disqualify, 10 Mark Montoya ("Mr. Montoya") states that he first met Timothy D. Ronan, a lawyer with 11 Davis Miles, PLLC, ten years ago through an introduction from his stepfather, Peter J. 12 Mizioch. (Doc. 204, Exh. B at 1.) At that time, according to the Declaration, Mr. Mizioch 13 allegedly "encouraged [Mr. Montoya] to regard Mr. Ronan as [his] lawyer" and that if he had 14 "any legal issues [he] should call him for help." (*Id.*)

15 Mr. Montoya alleges in his Declaration that he sought Mr. Ronan's advice on a 16 number of legal issues over the past five or six years, including: (1) his pending divorce, (2) 17 his post-divorce custody dispute, (3) his financial problems and pending bankruptcy, and (4) 18 his litigation with John McKindles concerning unpaid legal fees. (*Id.* at 2-3.) With regard to 19 his pending divorce, Mr. Montoya claims in his Declaration that he discussed "very personal 20 and financial issues involving assets, liabilities, divorce, my daughter, custody, and such" 21 with Mr. Ronan. (*Id.* at 2.) According to Mr. Montoya's Declaration, Mr. Ronan did not 22 personally represent him in any of the above stated legal matters but rather referred him to 23 other attorneys who practice in the areas of divorce and bankruptcy. (*Id.* at 2-3.) Mr. 24 Montoya makes no mention in his Declaration of whether or not he paid for these alleged 25 legal services, but states that "I trusted Mr. Ronan as my lawyer and relied on his advice" and 26 "I understood that the information I provided Mr. Ronan was confidential based on our long-27 standing attorney/client relationship." (*Id.* at 3.)

28 Mr. Montoya also alleges in his Declaration that Mr. Ronan represented him in the

formation of Marky Polo Pool Service, LLC, a limited liability company owned by Mr. Montoya and his brother Russell. (*Id.* at 2.) Mr. Montoya alleges that Mr. Ronan gave him legal advice "regarding financial and other matters" in conjunction with the formation of his company. (*Id.*) Mr. Montoya also states that Mr. Ronan acted as the statutory agent of the company until mid-2010. (*Id.*) Again, there is no mention of whether or not Mr. Montoya paid Mr. Ronan for these legal services.

Finally, Mr. Montoya alleges in his Declaration that another attorney at Davis Miles, David Williams, provided financial information to a collection attorney for the McKindles law firm that resulted in the reopening of that litigation. (*Id.* at 5.) Specifically, Mr. Montoya alleges that Mr. Williams informed the collection attorney for the McKindles law firm that he and his brother had inherited $500,000 apiece as a result of their mother's death. (*Id.*) Furthermore, Mr. Montoya alleges that Mr. Williams identified the location of his bank accounts for the collection lawyer for the McKindles law firm, and also that Mr. Williams appeared at an evidentiary hearing in that case. (*Id.*)

In the "Declaration of Timothy D. Ronan," Exhibit 1 of the Response to the Motion to Disqualify, Mr. Ronan claims that he "never served as Mark Montoya's or Russell Montoya's attorney" and has "never provided them legal services or legal counsel related to their personal needs."(Doc. 217, Exh.1 at 2.) Although Mr. Ronan concedes that his client, Mr. Mizioch, has at times requested that Mr. Ronan "provide limited advice to some of his family members," he contends that he "never considered Mr. Mizioch's family members to be [his] clients," unless the family member specifically retained him as counsel. (*Id.*) Mr. Ronan also states that none of Mr. Mizioch's family members have paid for any legal services "unless they have specifically retained [him] as counsel." (*Id.* at 3.) Any limited legal services that Mr. Ronan may have provided to Mr. Mizioch's family members "have always been at Mr. Mizioch's request and direction." (*Id.*)

Mr. Ronan states in his Declaration that he never spoke with Mr. Montoya about his pending divorce or post-divorce custody issues, and that Mr. Montoya never shared any personal information related to those issues. (*Id.* at 4.) Mr. Ronan states that he does not

- 4 -

1  practice in the area of family law and therefore would not have represented Mr. Montoya in
2  such matters. (*Id.*) Mr. Ronan claims that he was aware that Merrick Firestone, a former law
3  partner, was contacted by Edward Maciag on Mr. Montoya's behalf regarding his divorce
4  and post-divorce custody issues, and that Mr. Firestone referred Mr. Montoya to attorney
5  John McKindles. (*Id.*) Mr. Ronan states that the only time he was contacted directly by Mr.
6  Montoya was in 2009 for a referral to a bankruptcy attorney. (*Id.* at 3.) Mr. Ronan states that
7  he provided a referral to John Futkin, but that Mr. Montoya "never communicated any details
8  about his personal financial situation." (*Id.*)

Mr. Ronan also states in his Declaration that he did not represent Mr. Montoya in 2009 with regards to the litigation action involving Mr. McKindles and alleged unpaid legal fees. (*Id.* at 4.) Mr. Ronan states that he told Mr. McKindles and his attorney, Mr. Holcomb, "verbally and by electronic mail multiple times that [he] did not represent Mr. Montoya," and that he finally "sent written correspondence . . . that [he] did not represent Mr Montoya." (*Id.*) A copy of the letter sent to Mr. Holcomb on February 9, 2010 is attached as Exhibit 2. Mr. Ronan also states that a copy of the letter was sent to Mr. Montoya. (*Id.*)

Finally, Mr. Ronan acknowledges that he did prepare Articles of Organization for Mr. Montoya's pool company, Marky Polo Pool Service, LLC. (*Id.*) However, Mr. Ronan alleges in his Declaration that he "never spoke with Mr. Montoya about the preparation of the Articles of Organization and prepared the Articles of Organization only at Mr. Mizioch's request." (*Id.* at 5.) Furthermore, Mr. Ronan alleges that Mr. Mizioch is the one who paid him for his legal services. (*Id.*) Mr. Ronan states that he "only represented the LLC related to the formation and the amendment of the Articles of Organization and never considered Mark or Russell Montoya" to be his clients. (*Id.*)

David Williams, another attorney with the Davis Miles law firm, provided a separate Declaration to rebut some of the allegations made by Mr. Montoya. Mr. Williams states that he never represented Mr. Montoya, was never privy to any attorney-client information from Mr. Montoya, and never provided confidential information to Alan Holcomb, the collections attorney for the McKindles law firm. (*Id.*, Exh. 11 at 2.) Mr. Williams alleges that he learned

- 5 -

1 about the McKindles litigation against Mr. Montoya through independent research on the
2 Maricopa County Recorder's website. (*Id.*) Mr. Williams claims that he contacted Mr.
3 Holcomb to inquire about the McKindles litigation as it related to his firm's legal theory that
4 Mr. Montoya had a financial motive to be involved in his mother's death. (*Id.* at 3.) During
5 the course of that conversation with Mr. Holcomb, Mr. Williams states that he provided Mr.
6 Holcomb with a copy of Mr. Mizioch's cross-claim against the Montoyas. (*Id.*) Mr.
7 Williams also states in his Declaration that he provided Mr. Holcomb with requested
8 information that he received through discovery pertaining to Mr. Montoya's receipt of the
9 $500,000 life insurance policy. (*Id.*) Mr. Williams states that this information was not subject
10 to a protective order. (*Id.* at 4.)

11 Mr. Montoya and two attorneys for the Davis Miles law firm, Mr. Ronan and Mr.
12 Williams, have submitted dueling Declarations addressing the issue of whether or not Mr.
13 Montoya is a former client of Davis Miles. Mr. Montoya makes several claims in his
14 declaration that he relied on certain attorneys at Davis Miles to "receive[] advice and
15 assistance . . . in matters pertinent to the legal profession." *Foulke*, 784 P.2d at 726.
16 Specifically, Mr. Montoya alleges that he contacted Mr. Ronan on multiple occasions to
17 discuss personal and financial matters pertaining to his divorce, a child custody dispute, and
18 his filing for bankruptcy. Mr. Ronan disputes that he was ever contacted by Mr. Montoya to
19 receive any kind of legal advice on those matters. In fact, Mr. Ronan has supplied one piece
20 of evidence, a letter to Mr. Holcomb addressed on February 9, 2010, suggesting that not only
21 did Mr. Ronan not represent Mr. Montoya, but he also took active steps to disavow him of
22 that notion. (Doc 217, Exh. 2.) Mr. Ronan concedes only that he provided Mr. Montoya with
23 a reference to a bankruptcy attorney and prepared the Articles of Organization for Marky
24 Polo Pool Service, LLC at the request of Mr. Mizioch. Nonetheless, Mr. Ronan states that
25 he never received confidential information from or provided representation to Mr. Montoya
26 in either of those instances. Furthermore, there is no indication that Mr. Montoya ever paid
27 any attorney at Davis Miles for any advice or legal representation.

28 Given the conflicting Declarations, the Court cannot determine whether or not Mr.

1  Montoya is in fact a former client of Davis Miles. But the Court need not resolve that issue
2  because even if Mr. Montoya was a client, the current litigation is not the same or
3  substantially related to any previous alleged representation of Mr. Montoya by Davis Miles.

### b. Substantially Related

The Davis Miles law firm may be disqualified if, in representing Mr. Mizioch in the current litigation, Davis Miles is "representing someone in the same or a substantially related matter whose interests are materially adverse" to Mr. Montoya's interests. *Foulke*, 784 P.2d at 726-27. There must be some "factual nexus" between the prior representation and the current matter, meaning that "the matters *themselves* must be substantially interrelated." *Amparano v. ASARCO, Inc.*, 93 P.3d 1086, 1093 (Ariz. Ct. App. 2004) (quoting Ariz. State Bar Comm. On Rules of Prof'l Conduct Ethics Op. 94-06 (1994)). The party moving to disqualify opposing counsel has the burden to show "sufficient reason" why the attorney should be disqualified. *Id.* at 1093, 377 (quoting *Alexander v. Superior Court*, 685 P.2d 1309, 1313 (Ariz. 1984)).

In *Foulke*, Mr. Foulke met with an attorney, Ann Haralambie, to discuss his pending divorce from his wife, Mary E. Ellingsen. *Foulke*, 784 P.2d at 725. The parties disputed precisely what information was exchanged between Mr. Foulke and Ms. Haralambie during the one meeting, although it was conceded that Mr. Foulke paid Ms. Haralambie for her services. *Id.* Approximately seven months later, Ms. Ellingsen retained Ms. Haralambie to represent her in her divorce proceedings against Mr. Foulke. *Id.* Less than two weeks after receiving notice of Ms. Haralambie representation, counsel for Mr. Foulke requested that she withdraw due to a conflict of interest. *Id.* When Ms. Haralambie refused, counsel for Mr. Foulke immediately filed a motion to disqualify. *Id.* The Court granted the motion to disqualify, holding that Ms. Haralambie's representation of Ellingsen violated Rule 1.9(a) of the Arizona Rules of Professional Conduct. *Id.* at 730. The court reasoned that disqualification was not only appropriate but necessary in this case "[b]ecause of the mandatory nature of ER 1.9(a), the presumption that confidences have been divulged, the nature of Foulke's consultation, and Foulke's vigorous opposition to Ms. Haralambie's

representation of Ellingson." *Id.* at 729.

In contrast, in *Amparano*, an attorney, Howard Shanker, had worked at the law firm of Fennemore Craig, P.C. for two years. *Amparano*, 93 P.3d at 1092. During his time there, Shanker worked in the firm's environmental and natural resources practice group and was alleged to have worked on numerous projects relating to permitting, lobbying, and enforcement issues for one of the firm's clients, ASARCO. *Id.* at 1093. Three years after he left Fennemore Craig, Shanker became involved in a case against ASARCO. *Id.* ASARCO subsequently filed a motion to disqualify Shanker, arguing that a conflict of interest existed because of Shanker's prior representation of ASARCO. *Id.* The court denied the motion to disqualify. *Id.* at 1094. The court reasoned that the dearth of evidence presented by ASARCO failed to support the claim that Shanker was "'environmental counsel for ASARCO' or that he would have been aware of litigation strategy ASARCO's counsel might use." *Id.* at 1093.

The current litigation in this Court between the Montoyas and Mr. Mizioch involves a dispute over life insurance proceeds from Protective Life Insurance Company and AXA Equitable Life Insurance Company and other cross-claims related to her death. Mr. Mizioch and the Montoyas have competing claims to the life insurance policies.

Mr. Montoya alleges that the Davis Miles law firm learned personal, confidential information from him as a former client, and that the law firm is now using that information against him. Although Mr. Montoya claims that the Davis Miles law firm is using several pieces of confidential information against him, the thrust of his argument is that Davis Miles learned of Mr. Montoya's financial difficulties through their representation of him and are now using that information to fuel their legal theory that Mr. Montoya killed his mother because of his financial situation. It is possible that the Davis Miles law firm learned this information when Mr. Montoya spoke with Mr. Ronan about his pending divorce and bankruptcy, as he alleges. It is equally possible that the Davis Miles law firm learned this information through their representation of Mr. Mizioch and independent investigation.

Even if an attorney-client relationship existed between Mr. Montoya and the Davis Miles law firm, the matters in which Mr. Montoya alleges he relied on the representation of

Mr. Ronan or Mr. Williams are not substantially related to the present matter. Comment [3] to the Arizona Rules of Professional Conduct states that "[m]atters are 'substantially related' . . . if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." This current insurance policy benefits dispute is not the "same transaction or legal dispute" as the alleged prior representations that involved Mr. Montoya's divorce, child custody, bankruptcy, and business incorporation. Thus, disqualification may only be appropriate if there "is a substantial risk that confidential factual information" will be used against Mr. Montoya. Like the moving party in *Amparano* who failed to carry its burden of proving the substantial relationship between past alleged representation and present litigation, counsel for Mr. Montoya fails to provide adequate proof that Davis Miles is using any confidential information obtained from past alleged representation against Mr. Montoya. In his Declaration, Mr. Montoya makes only a general reference to the "very personal and financial issues" he allegedly shared with Mr. Ronan. Furthermore, comment [8] to the Arizona Rules of Professional Conduct states that "the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." It appears in this case that the information used by Davis Miles to form their legal theory against Mr. Montoya was obtained through independent investigation of public sources or through their client.

Finally, disqualification would be an excessive result in this case. Generally, "whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients." *Alexander v. Superior Court*, 685 P.2d 1309, 1313 (Ariz. 1984); *see also Hrudka v. Hrudka*, 919 P.2d 179, 184 (Ariz. Ct. App. 1995) ("In resolving conflicts of interest, courts should attempt to reach the solution that is the least burdensome upon the client. Disqualification may be avoided if the hardship to the new client far outweighs the injustice to the former client who requests disqualification."). The complaint in this case was filed in August 2010, and Mr. Montaya's attorney was aware of the alleged conflict no later

1 than January 5, 2011, when he filed a Reply in Superior Court to disqualify Mr. Mizioch as
2 personal representative (Doc. 217, Exh. 13). In *Foulke*, the Motion to Disqualify Opposing
3 Counsel was made within a month of notice of the conflict of interest, whereas here at least
4 7 months has passed between Mr. Montoya's initial awareness of the alleged conflict and his
5 Motion to Disqualify.

6 For these reasons, the Motion to Disqualify will be denied.

### III.     Motion for an Order Restricting Extrajudicial Comments

8 The Court is empowered to issue a restraining order prohibiting trial participants from
9 communicating with the media where "excessive trial publicity" endangers the fairness of
10 the judicial process. *Levine v. United States District Court for the Central District of
11 California*, 764 F.2d 590, 600-01 (9th Cir. 1985); *see also* Local Rule of Civil Procedure
12 83.8(b) (stating that "[i]n a widely publicized or sensational case" the Court "may issue a
13 special order [prohibiting extrajudicial statements] similar to that provided for by Rule
14 57.2(f), Local Rules of Criminal Procedure"). However, such an order "is properly
15 characterized as a prior restraint," and is therefore "subject to strict scrutiny because of the
16 peculiar dangers presented by such restraints." *Levine*, 764 F.2d at 595; *see also Nebraska
17 Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (stating that prior restraints "are the most
18 serious and least tolerable infringement on First Amendment rights"). An order prohibiting
19 communication with the media may be upheld only if: "(1) the activity restrained poses either
20 a clear and present danger or a serious and imminent threat to a protected competing interest;
21 (2) the order is narrowly drawn; and (3) less restrictive alternatives are not available." *Levine*,
22 764 F.2d at 595 (internal citations omitted).

23 *Levine* involved a criminal proceeding against a former special agent with the Federal
24 Bureau of Investigation charged with espionage. *Id.* at 591. Counsel for both the government
25 and defense engaged in "on the record" interviews with the media early in the proceedings.
26 *Id.* at 592. The government sought a court order prohibiting the parties from making any
27 extrajudicial statements to the media, which the court denied. *Id.* Nonetheless, the court
28 "admonished counsel to maintain an atmosphere in which a fair trial could be conducted."

- 10 -

1 *Id.*

2 Less than three months later, on the eve of trial, the *Los Angeles Times* published an
3 article that "set forth the defense theory in great detail" and quoted the defense attorney
4 "attack[ing] the basis of the prosecution's case." *Id.* The government renewed its motion, and
5 the district court issued an order that "all attorneys in this case . . . shall not make any
6 statements to members of the news media concerning any aspect of this case that bears upon
7 the merits to be resolved by the jury."*Id.* at 593. The Ninth Circuit agreed that the district
8 court's order was appropriate given the circumstances, but it nonetheless issued a writ of
9 mandamus ordering the district court to more narrowly and specifically "define the scope of
10 the restraining order." *Id.* at 601. The Appellate Court first determined that pretrial publicity
11 had already been widespread and that further publicity instigated by extrajudicial statements
12 by counsel would pose a "serious and imminent threat to the administration of justice" and
13 add to the "circus-like environment" surrounding the trial. *Id.* at 598. But the Appellate Court
14 determined that the district court's order was overly broad because it prohibited statements
15 that would "present no danger to the administration of justice." *Id.* at 599. The Court
16 therefore directed the district court to define the scope of the restraining order specifying the
17 types of proscribed statements. *Id.*

18 The facts and allegations of pretrial publicity in this case are distinguishable from
19 *Levine* and do not warrant an order prohibiting extrajudicial statements to the media. Unlike
20 the "widespread publicity" and "circus-like environment" mentioned in *Levine*, the interest
21 and publicity in this case does not appear to rise to that same level. Counsel for Mr. Mizioch
22 can point to only two instances of media publicity or interest pertaining to this case. The first
23 instance of pretrial publicity is an article published in The Arizona Republic on February 26,
24 2011. Dennis Wagner and Michael Ferraresi, *Insurance claims from slayings linked to*
25 *Phoenix contractor*, THE ARIZONA REPUBLIC (Feb. 26, 2011). However, this article appeared
26 in the newspaper over six months ago, unlike the *Los Angeles Times* article in *Levine* that
27 appeared on the eve of trial. Furthermore, the article is based almost entirely on public
28 records obtained by the reporters, and the few quotes attributed directly to counsel for both

parties do not divulge any kind of prejudicial information.[3]

Counsel for Mr. Mizioch also argues that there is demonstrated media interest in this litigation as evidenced by the fact that attorneys for both parties were contacted twice by an employee with CBS News-48 Hours. In his motion, counsel states that he does not know what information opposing counsel may have provided to CBS News-48 Hours.[4] Counsel further states that the last known contact made by CBS News-48 Hours was on May 11, 2011. It is merely speculative at this point whether the initial investigation initiated by CBS News-48 Hours three months ago will yield any actual media coverage. Two phone calls from CBS News-48 Hours do not constitute an "aggressive investigation," as counsel for Mr. Mizioch characterizes it. Furthermore, if such a news story should materialize, that would not necessarily prejudice the judicial process. A fair trial does not require that jurors be "totally ignorant of the facts and issues involved" in a case. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). It should be expected that an important case may arouse public interest concomitant with the nature of the alleged crime, but this will not necessarily and inevitably lead to the kind of widespread media circus mentioned in *Levine*. *Crater v. Galaza*, 491 F.3d 1119, 1134 (9th Cir. 2007).

Finally, counsel for Mr. Mizoch alleges that the Montoyas have proactively solicited media coverage in this case. However, the mere fact that one news article was written over six months ago[5] and an employee from CBS News-48 Hours attempted to contact both

---

[3] Attorneys for both parties are quoted to the extent that their respective clients were not involved in the murder of Phyllis Mizioch. The only arguably prejudicial direct quotes made in the article are attributed to Edward Maciag, a friend and associate of Mr. Mizioch. In fact, in his reply brief, Mr. Mizoch's counsel acknowledges that Mr. Maciag consented to the interview and that Mr. Mizoch's counsel accompanied him during the interview (Doc. 194 at 4).

[4] In his response, counsel for the Montoyas states he only provided pleadings already filed in the case (Doc. 193 at 4).

[5] On September 30, 2011, a new article appeared in The Arizona Republic titled "$4.5 mil life insurance battle takes a new twist." The article provides a summary of recent court

- 12 -

parties does not provide conclusive evidence that the Montoyas have sought to drum up media attention or engaged in improper extrajudicial statements. Counsel for Mr. Mizioch further states that members of Phyllis Mizioch's family had been contacted via text message by Mark Montoya about his alleged attempts to contact CBS News-48 Hours about a possible news story. However, this allegation is based only on a declaration made by Mr. Mizioch's attorney, David Williams. This statement is not supported by evidence of the alleged text messages or declarations from any particular family member.[6] Without stronger evidence of a "clear and present danger" or a "serious and imminent threat" to the integrity of the judicial process, this Court cannot issue an order that would prohibit both sides from engaging in improper extrajudicial statements to the media.

This Court would remind counsel for both parties that they have a duty to refrain from attempting to gain leverage in this case by speaking to and through the media. As counsel for Mr. Mizioch correctly points out, Local Rule of Civil Procedure 83.8 prohibits a lawyer in a civil action from "making an extrajudicial statement, other than a quotation from or reference to public records . . . if there is a reasonable likelihood that such dissemination will interfere with a fair trial . . . ." Similarly, Rule 3.6(a) of the Arizona Rules of Professional Conduct prohibits attorneys from making any "extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."[7] Although neither Local Rule of Civil Procedure 83.8 nor Rule 3.6 of the Arizona Rules of Professional Conduct create an absolute prohibition on all statements to the media,

---

proceedings in this case of interest, but there is nothing in the article that suggests improper extrajudicial communication with the media from either party.

[6] In his reply, counsel for Mr. Mizioch states that he does not have copies of the original text messages and that Mr. Mizioch does not want to disclose the names of the family members in order to protect their privacy (Doc. 194 at 4 n.2).

[7] This is identical to Rule 3.6(a) of the ABA Model Rules of Professional Responsibility.

- 13 -

1  counsel for both parties are cautioned to use professional discretion and limit any statements
2  to what is explicitly authorized by the applicable Rules. In the event that future extrajudicial
3  statements to the media threaten the integrity of these proceedings, the Court will address the
4  issue at that time.

   For these reasons, the Motion to Restrict Extrajudicial Communication will be denied.

   Accordingly,

   **IT IS ORDERED** that the Motion for an Order Restricting Extrajudicial Comments (Doc. 188) will be denied.

   **IT IS FURTHER ORDERED** that the Motion to Disqualify (Doc. 204) will be denied.

   **IT IS FINALLY ORDERED** that the Motion for an Order Shortening Time to Respond (Doc. 188) is moot and is therefore denied.

   DATED this 14th day of October, 2011.

   James A. Teilborg
   United States District Judge